■ CHARLES MILLER et al., Respondents, v WILLIAM SCHREYER et al., Appellants, et al., Defendants. [606 NYS2d 642] —Order of the Supreme Court, New York County (Carol Arber, J.), entered November 5, 1992, which denied defendants' motion to dismiss the complaint, unanimously affirmed, without costs.

This action was brought derivatively on behalf of Merrill Lynch & Co., Inc., the beneficiary of the action, to recover for damage sustained by the corporation as a result of defendants' alleged abdication of their responsibilities as corporate directors. The complaint asserts that a breach of fiduciary duty by the directors facilitated the perpetration of a $900-million illegal securities "parking scheme" with a now-defunct Florida insurer, Guaranty Security Life Ins. Co. ("GSLIC") by employees of the corporation. Securities parking schemes are a violation of Federal securities laws for which several prominent individuals have been sent to prison in recent years (see, e.g., United States v Bilzerian, 926 F2d 1285, cert denied — US —, 112 S Ct 63). This action was instituted following the disclosure that Merrill Lynch & Co. had been implicated in a massive five-year, junk-bond parking scheme with GSLIC.

The complaint asserts that GSLIC's capital fell below regulatory requirements when the market for non-investment grade ("junk") bonds, in which GSLIC had invested a substantial portion of its portfolio, collapsed following various scandals involving Michael Milken and the securities firm of Drexel Burnham Lambert. In an effort to mislead regulators and stave off forced liquidation, GSLIC entered into a scheme with Merrill Lynch & Co. to falsify GSLIC's balance sheet and enhance its year-end reports. From 1984 to 1988, shortly before the end of the calendar and fiscal year, GSLIC exchanged its junk bond holdings for United States Treasury securities and similar high quality securities owned by Merrill Lynch & Co. Consequently, GSLIC's year-end financial statements reflected the ownership of high quality securities, not depreciated junk bonds. The prices at which the securities were exchanged (roughly $152 million in 1984 and nearly twice that amount in 1986) were manipulated to augment GSLIC's apparent capital position. Soon after the year-end report was issued, the two companies unwound the transactions at agreed prices, which assured Merrill Lynch that it would sustain no loss. The transactions were a complete sham in which confirmation slips were altered to falsify trade dates. Had GSLIC accurately reported its portfolio and allocated the proper reserves, it would have been insolvent by 1985. The complaint alleges that the magnitude of the transactions with a relatively small Florida insurance company and the circumstances under which the trades were executed should have come to the attention of a diligent board of directors. Plaintiffs assert that, had proper supervisory controls been in place, the timing of the securities swaps at year-end, the four-year duration of the practice, the non-market prices at which the securities were exchanged and the alteration of confirmation slips are circumstances which should have come to the attention of senior managerial supervisors and aroused suspicion at the highest levels of the corporation.

The illegal securities parking scheme has done significant damage to Merrill Lynch & Co., generally causing harm to the corporation's business reputation and exposing the company to criminal and civil liability for violation of Federal securities laws and for conspiring with GSLIC to defraud Florida insurance regulators. The corporation is a defendant in a suit by the Florida Insurance Department, GSLIC's receiver, for its participation in the scheme and is under criminal investigation by the United States Attorney. Plaintiffs maintain that the failure to monitor and oversee the Company's operations

and establish procedures to protect against employee misconduct is inaction, not action protected by the presumptions of the business judgment rule, and amounts to gross negligence in breach of defendants' fiduciary duties as directors.

The Merrill Lynch & Co. defendants' motion to dismiss the complaint is premised exclusively on plaintiffs' failure to make a pre-litigation demand on the board of directors. In denying the motion, Supreme Court concluded that, under Delaware law, the business judgment rule does not shield the directors, and that directors are not entitled to a pre-litigation demand if their own acts, as alleged in the complaint, constitute a breach of fiduciary duty. The court found that gross negligence was adequately pleaded in view of the magnitude and duration of the scheme which went undiscovered by the defendant directors. We agree.

The law of the State of incorporation governs the pre-litigation demand requirement in a shareholder derivative action *(Hart v General Motors Corp.,* 129 AD2d 179, 182, *lv denied* 70 NY2d 608). Its purpose is to require that a stockholder exhaust intracorporate remedies before commencing an action and to provide safeguards against strike suits *(Aronson v Lewis,* 473 A2d 805, 811-812 [Del 1984]). However, if it can be established that a board is incapable of fairly assessing a demand for a suit, a shareholder may arrogate to himself the board's authority to decide whether to commence litigation on the corporation's behalf. Notably, the shareholder's pleading burden in this case is a heavy one *(see, Levine v Smith,* 591 A2d 194, 207 [Del 1991]). The pre-litigation demand is waived only when the complaint contains well pleaded, factually specific allegations which rebut the presumption of director independence *(Levine v Smith, supra,* at 205).

The rule is clear in this State that no demand is necessary if "the complaint alleges acts for which a majority of the directors may be liable and plaintiff reasonably concluded that the board would not be responsive to a demand" *(Barr v Wackman,* 36 NY2d 371, 377; *compare, Curreri v Verni,* 156 AD2d 420 [no demand necessary where alleged wrongdoers comprise majority of board], *and Lewis v Welch,* 126 AD2d 519 [unreasonable to conclude board would be unresponsive where 14 of 17 members are independent "outside" directors]).

Defendants-appellants have presented no authority to demonstrate that the law of Delaware is materially different in this regard. Defendants intimate that three directors, who took office subsequent to the malfeasance complained of in

this case, might be appointed as an independent committee to investigate the allegations of the complaint and evaluate whether to institute an action on behalf of the corporation. However, in the absence of any indication in the record that such an independent committee has in fact been formed, we decline to depart from the well established presumption that the alleged malfeasance of the majority of the board of directors, pleaded with particularity in the complaint, renders service of a demand a futile gesture *(Barr v Wackman, supra,* at 379). Concur—Rosenberger, J. P., Ellerin, Kupferman and Rubin, JJ.